Filed 11/5/13  P. v. Carter CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>WILL SCOTT CARTER,<br><br>　　　Defendant and Appellant. | B246024<br><br>(Los Angeles County<br>Super. Ct. No. TA121573) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Pat Connolly, Judge.  Affirmed.

　　　　Heather J. Manolakas, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　No appearance for Plaintiff and Respondent.

Defendant and appellant, Will Scott Carter, appeals from the judgment entered following his plea of no contest to inflicting corporal injury on a spouse, cohabitant or child's parent (Pen. Code, § 273.5, subd. (a))[1] and his admissions he previously had been convicted of a serious felony within the meaning of section 667, subdivision (a)(1) and the Three Strikes law (§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and had served a prior prison term within the meaning of section 667.5, subdivision (b). The trial court sentenced Carter to 14 years in prison. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*[2]

Gwendolyn Moore had dated and lived with Carter for "[f]ive or six months." However in December 2011, Moore ended the relationship, moved out of Carter's home and into an apartment on South Central Avenue in Los Angeles. Carter did not move with Moore and never lived with her at the South Central Avenue address.

On the evening of January 9, 2012, Moore was at home with her daughter's boyfriend, a man named Jesse Hendley. Hendley was living with Moore and Moore's daughter at the time.

At approximately 9:00 p.m., Carter went to Moore's South Central Avenue apartment. When Moore opened the door and saw Carter she was surprised. He had told Moore he would be coming to visit on another day. Carter, who was still dressed in his work clothes and had his "rolling bag" with him, asked Moore why she had not returned his calls. Carter then entered the apartment, sat down and began to talk about why he and Moore should "get[] back together." Moore responded, " 'No, we still need a break. We still need to take time to get . . . things together. You need to get yourself together, and I need to get myself together.' " Moore's comment upset Carter and he asked if he could use Moore's phone. Carter then called his sister and asked her, " 'How many times did I try to call [Moore]?' " When he finished speaking with his sister, Carter looked "mad" or

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    The facts have been taken from the transcript of the preliminary hearing.

"sad." He got up and went to the restroom and, when he returned, he asked Moore who else was at home. Moore, who "felt like [she] didn't owe [Carter] an explanation [regarding] why [or whether anyone] was there," told Carter she was home alone.

Carter got up and began to pace back and forth, then stopped and "stood over" Moore who was sitting on the couch and "playing with [her] phone." Carter, who still sounded upset, told Moore she was going to help him take his things home. Moore stated she was not going to help Carter. Moore continued, " 'What does it look like[.] [M]e getting on the bus taking your things home, helping you?' "

Carter, who had moved to the middle of the room, was pacing back and forth, looking for a box. He told Moore, " 'You put all my stuff in a box. Find [the] box.' " At that point, Carter moved toward Moore, stood over her and again told her she was going to help him. When he was standing within inches of Moore, Carter made his hands into fists and "moved them sort of back and forth left to right, just a few inches at a time." Carter then retrieved a screwdriver from his back pocket and hit Moore with it on the left side of her face. Although he struck her only once with the screwdriver, Carter continued to hit Moore on the left side of her face. Moore screamed, called out for help and attempted to get up from the couch, but Carter kept pushing her back.

When Hendley heard Moore screaming, he came out from the bedroom where he had been sleeping and into the living room. Moore, who was sitting on the couch, was crying and acting as though she wanted Carter to "get away from her." When Carter saw Hendley, he backed up and stopped beating Moore. While the two men were then "saying something to each other," Moore got up from the couch, ran to the door, opened it and ran outside. Carter ran after Moore, caught up with her and told her to stop "screaming and hollering." When Hendley then came outside, Moore was able to get away from Carter and go back inside the house. Hendley prevented Carter from going back inside the apartment and Moore did not see Carter after that. Once they were both inside, Hendley helped Moore find her phone, which had fallen underneath the couch, and she called 911.

3

Both police and paramedics responded to Moore's call. Carter's attack with a screwdriver left what paramedics indicated was "like a paper cut up under [Moore's] eye" and they recommended she put an ice pack on it to stop the bleeding and swelling. As a result of Carter's actions, Moore still suffers from soreness around the injury on her face and at times has a ringing in her ear.

2. *Procedural history*.

Following the preliminary hearing, on February 14, 2012 a two-count information was filed alleging Carter had committed assault with a deadly weapon (§ 245, subd. (a)(1)) and the infliction of corporal injury to a spouse, cohabitant or child's parent (§ 273.5, subd. (a)).

At proceedings held on March 13, 2012, Carter made a *Marsden*[3] motion. Outside the presence of the prosecutor, Carter indicated that in 1978 he had entered a plea to second degree murder in violation of section 187. In 1988, he had been convicted of another "strike" case. However, it was Carter's understanding the Three Strikes law did not go into effect until much later, in the early 1990's, and he did not understand why it was being applied to him. The trial court explained the Three Strikes law was retroactive and applied to all qualifying prior convictions. Although under some circumstances a trial court had the ability to "strike" a prior, particularly if it was very old, since Carter's 1978 conviction had been for murder, it was unlikely any court would strike that conviction. Moreover, the trial court pointed out Carter had a second strike from "just . . . a couple [of] years ago." He had willfully threatened to commit a crime which would result in death or great bodily injury to another in violation of section 422. Carter, however, insisted that as part of his plea agreement the violation of section 422 was not to be considered a strike. Carter asserted the transcript of the plea proceedings indicated " 'and no strike.' " Defense counsel, who had reviewed the transcript of both the plea and sentencing proceedings, disagreed with Carter. When the trial court then reviewed the transcript of the plea and sentencing proceedings, it too concluded Carter was

---

[3]     *People v. Marsden* (1970) 2 Cal.3d 118.

mistaken. The trial court indicated there was nothing in the record to indicate Carter's prior conviction of section 422 was not to be considered a strike.

In addition to the misunderstanding regarding strikes, Carter indicated that on two occasions his counsel had told him she would come to see him. She, however, had failed to "show up" either time. Carter also felt there was a "conflict of interest" because the victim in this matter was a female and he believed his counsel, who was also female, was working "against [him], instead of trying to help [him.]"

In response, defense counsel explained that, before the *Marsden* hearing, Carter had asked her to make a motion to strike his prior convictions. Counsel had explained to Carter that such a motion was to be dealt with at sentencing or if he decided to negotiate a plea. In addition, Carter had asked counsel to "file a 995 [motion] regarding the screwdriver." Counsel had informed Carter she did not believe such a motion would be appropriate.

The trial court addressed Carter and indicated it had known defense counsel for several years. The court then noted "the one thing that she does do is protect her clients." The court continued: "And it doesn't matter if you're a male. It doesn't matter if you're a female. I've never seen [counsel] do anything that would make me think . . . she is sexist, or because of the nature of these charges believes that you're a bad guy . . . . [¶] As a matter of fact, the exact opposite is true. . . . [¶] . . . [¶] As far as her not showing up, I don't know if that was a miscommunication, but I can tell you this. [Counsel] handles a lot of cases just in this court alone, let alone what she has outside. And if I were sitting in your seat right now . . . not only would I feel very comfortable . . . [I would recognize] [s]he knows the court. She knows how to handle her cases." The trial court then indicated that, when it referred to "this court," it was referring to himself "and the other judges in [the] building. She understands what the DA's office will do and won't do. She understands what is in your best interest . . . ." The trial court then indicated, no matter how old it was, Carter's murder conviction would likely never be stricken. With regard to his conviction of threatening to commit a crime in violation of section 422, even if the court were to strike the conviction under the Three Strikes law, both the murder and

5

the threat to commit a crime were "five year priors that ha[d] to be imposed." The trial court, accordingly, informed Carter he was "not talking about a little bit of time." The court then denied Carter's *Marsden* motion and invited the district attorneys to come back inside the courtroom.

After an unreported discussion was held at the bench, the trial court addressed Carter and informed him the People had made an offer which was less than the court would give him. The trial court continued: "Beyond that, though, you also have a situation where the People are going to be filing an amended information, and they're also going to be, I would assume, having that offer go up." The trial court then told Carter the People's offer was for 14 years in prison. The court also informed Carter that, if he were to go to trial, all things considered he was "going to be looking at 35 years to life."

Defense counsel indicated, although they intended to file an amended information, the People would "allow [their] offer [of 14 years] to remain open until [the following] Tuesday," March 20. The trial court then addressed Carter and stated: "Mr. Carter, I expect you to think about these things. When I bring you back on March 20th, we're not going to spend a half hour on it. We're going to spend a minimum amount of time, and you're either going to take that deal or . . . we'll be putting it over for trial."

On March 20, 2012, the People filed an amended information. In count 1, it was alleged Carter had committed the serious felony of assault with a deadly weapon (§ 245, subd. (a)(1)) and in count 2 it was alleged he had committed the felony of inflicting corporal injury on a spouse, cohabitant or child's parent (§ 273.5, subd. (a)). It was further alleged as to both counts that they were serious, violent or required registration pursuant to section 290, subdivision (c) and that time spent in custody for the offenses was required to be served in state prison (§ 1170, subd. (h)(3)). It was also alleged that in the commission or attempted commission of the two offenses, Carter had personally used a deadly and dangerous weapon, a screwdriver, causing the offenses to be serious felonies within the meaning of section 1192.7, subdivision (c)(23). With regard to both counts, the information alleged Carter had suffered prior convictions for two serious

6

felonies within the meaning of section 667, subdivision (a)(1), and had served prison terms for the offenses within the meaning of section 667.5, subdivision (b). In addition, as to count 1 the information alleged Carter had suffered two prior serious or violent felony convictions or juvenile adjudications within the meaning of the Three Strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)).

After hearing the charges alleged in the amended information, Carter decided to enter a plea. Before doing so, Carter indicated he wished to, over defense counsel's adamant objection, address the trial court and present to the trial court a letter. Carter then indicated that, after he had been released from jail in 2009, he was required to go to the morgue to identify his daughter's body. She had been murdered by her husband and, after having had this experience, Carter indicated he "wouldn't dare hurt anybody, another lady." The trial court indicated, after hearing Carter state he would never commit any of the crimes he had been charged with, the court was not going to accept his plea. The court stated it would recall the case at a later time.

Later that day, the trial court again called Carter's case. After determining Carter had been given the opportunity to confer with his counsel, the trial court indicated it would accept his plea. Carter waived his right to a trial by a court or jury, his right to confront and cross-examine the witnesses against him, his right to subpoena witnesses to testify in his defense at no cost to him and his right "against self-incrimination," then pled no contest to count 2, inflicting corporal injury to a spouse, cohabitant or child's parent in violation of section 273.5, subdivision (a). Carter then admitted, pursuant to the Three Strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)) and section 667, subdivision (a)(1), having suffered a prior conviction for murder (§ 187) and, pursuant to section 667.5, subdivision (b), having suffered a prior conviction and prison term for willfully threatening another within the meaning of section 422 (§ 667.5, subd. (b)). The trial court, joined by defense counsel, found there was a factual basis for the plea and admissions, that each waiver had been "knowingly, understandingly, and explicitly made" and that Carter had been "convicted" of the offenses. After dismissing all

remaining counts and allegations, the trial court set sentencing and, if necessary, a restitution hearing for July 11, 2012.

At a hearing held on April 3, 2012, defense counsel addressed the trial court and indicated Carter had earlier told her he wished to withdraw his plea. However, that morning he had informed counsel he no longer wished to do so. Counsel "just wanted to make sure . . . [Carter] had the opportunity, since he [was there] in court, to address the court if he so chose . . . ." Carter then indicated the victim, Moore, had spoken to Carter's mother and told her she "was going to come and be honest about what [had] happened. [¶] [Carter] tried to explain this to [his] lawyer, that if it's like that, [he] would stand by withdrawing [his] plea. [However, when he did so, counsel] got [heated] at [Carter]." Carter indicated his counsel would not "let [him] talk."

The trial court indicated it was not that counsel would not let Carter speak, she was just "telling [him] to be careful. . . . Even though there [was] an agreed upon disposition, she [did not] want [Carter] to say anything [that was] going to hurt [him]." Carter stated he understood the things his counsel did not want him to say, but he had nothing to hide. Carter indicated he "didn't do it." The trial court replied, "Mr. Carter, I'm going to ask you this very simply. Are you making a motion to withdraw your plea at this time?" Following a discussion regarding, in particular, the sentence Carter could receive if he were to go to trial, Carter indicated he was "not going to make the motion."

At proceedings held on October 3, 2012, Carter made a second *Marsden* motion. Counsel explained Carter had again indicated to her he wished to withdraw his plea. However, after consulting with the appellate department at her office, as well as the head deputy, it was counsel's position she did "not have a good faith belief that there [was] an appropriate reason to [file such] a motion." Neither did counsel believe she had been ineffective. Had she thought there had been a genuine conflict, she would have asked the court to remove her from the case and appoint new counsel.

When Carter addressed the court, he indicated he believed the district attorney had originally made an offer of nine years in prison and that his counsel, in collusion with the People, had agreed they should raise the offer to 14 years in prison. Carter indicated he

8

had then told his counsel to "get [her] Ku Klux Klan ass out of [t]here" and that he was not taking nine years, much less 14. Carter stated: "I disrespected her. I am being honest about it. I was upset." Carter asserted his counsel spoke with his mother and sister, then came back into the courtroom and told him his mother had said if he did not take "the deal," he was not going to be able to see her anymore.

After Carter made a few additional comments, the trial court told him to "make [his] point because [he had] played games with [the] court for [too] long." The trial court told Carter to simply tell it why he wanted counsel off his case and the court would then make a ruling based on what Carter had said. Carter responded: "I really don't want her off the case. I want her to fight for me. That's all I want her to do. [¶] . . . [¶] [I] [d]on't want her to sell me out." After stating his counsel had not "sold [him] out," the trial court denied Carter's motion.

After the district attorney returned to the courtroom, the trial court indicated the parties were there for sentencing. Defense counsel informed the trial court Carter was at that time enrolled in two programs, an anger management course and a program called "Finding the Way." Counsel requested the court to "take those into consideration." When the prosecutor then indicated Carter was to be sentenced to 14 years as he had "pled to . . . count 2 [and] admitted the five-year prior and [one] strike[]," Carter commented, "I admitted?" The trial court responded, "You admitted to a five-year prior and one strike." When Carter stated he did not remember that, the court indicated, "Well, I do, and so you did[.]"

The trial court sentenced Carter to the upper term of four years for his conviction of inflicting corporal injury on a spouse, cohabitant or child's parent in violation of section 273.5, subdivision (a), then doubled the term to eight years pursuant to the Three Strikes law. For Carter's admission the offense was a serious felony within the meaning of section 667, subdivision (a)(1), the court imposed an additional five years. Finally, for his service of a prior prison term pursuant to section 667.5, subdivision (b), the court imposed an additional one year, for a total sentence of 14 years in state prison. The court then ordered Carter to pay a $960 restitution fine (§ 1202.4, subd. (b)), a stayed $960

9

parole revocation restitution fine (§ 1202.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), a $30 criminal conviction assessment (Gov. Code, § 70373) and restitution "in an amount that may be determined." The trial court signed a "Criminal Protective Order" under which Carter was precluded from having any contact with the victim, Gwendolyn Moore, for the next 10 years, then awarded Carter presentence custody credit for 267 days actually served and 40 days of conduct credit.[4]

On November 26, 2012, Carter filed a timely notice of appeal and request for a certificate of probable cause. In support of his request for a certificate of probable cause, Carter asserted the trial court improperly denied his request to withdraw his plea, appointed trial counsel failed to inform him his " 'wobbler' " assault charge required a finding of an injury amounting to a battery to qualify as a felony, his prior conviction was not originally deemed a "strike" and his sentence was "excessive." Then, in a letter filed December 19, 2012, Carter asserted his sentence was improper in that the statutes which permit enhancements may be "unconstitutional," the allegations of priors could be " 'invalid,' " and some enhancements may have been improperly imposed "based upon multiple use of the same facts." At proceedings held on December 19, 2012, the trial court indicated it had read and considered the two letters submitted by Carter and, as they failed to show a prima facie case for relief, his request for a certificate of probable cause was denied. The trial court added: "The burden is on the defendant to establish ground[s] for his release. The defendant['s] [contentions are] patently frivolous and/or lack[] merit on [their] face. The defendant's sentence was an agreed upon disposition between the parties. The defendant has abused [use of] the motion[s] by filing piecemeal and repetitious claims."

---

[4]    On June 17, 2013, Carter's counsel, citing section 4019, wrote a letter to the trial court indicating Carter should have been credited with 268 days actually served and 268 days of conduct credit. Counsel requested the trial court to "prepare, file and forward to the Department of Corrections an amended order and abstract of judgment reflecting the correct amount of presentence credit." On July 1, 2013, an amended abstract of judgment showing the correct number of presentence custody credits was filed in the trial court. The amended abstract of judgment was filed in this court on September 26, 2013.

10

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed July 22, 2013, the clerk of this court advised Carter to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider.

On August 6, 2013, Carter filed a response in which it appears he is asserting he had ineffective assistance of trial counsel. "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome [Citations.]" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.) Here, nothing in the record indicates counsel's representation fell below an objective standard of reasonableness. Counsel made appropriate motions, arguments and recommendations. This is particularly apparent when one considers that, had Carter gone to trial, he faced a prison term of 35-years-to-life. By entering into the plea agreement, as recommended by his counsel, Carter was sentenced to a term of 14 years in prison. Carter's contention his counsel refused to help him with his case is unsupported by the record. Counsel's actions were reasonable and assisted Carter in receiving a fair and favorable outcome.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.

12